Jeffrey Dean MAYNARD and Julie Etta Maynard, Appellants,

v.

Mohammad (Mike) BAZAZZADEGAN, and Julia Elaine Bazazzadegan, Respondents.

No. 14639.

Missouri Court of Appeals, Southern District, Division One.

July 8, 1987.

Larry K. Bratvold, Springfield, for appellants.

F. Richard Van Pelt, Van Pelt and Van Pelt, P.C., Springfield, for respondents.

CROW, Chief Judge.

Jeffrey Dean Maynard and Julie Etta Maynard sued Mohammad (Mike) Bazazzadegan and Julia Elaine Bazazzadegan for breach of a contract wherein the Bazazzadegans agreed to purchase a house and lot owned by the Maynards. The Bazazzadegans counterclaimed. The trial court, hearing the case without a jury, entered judgment in favor of the Bazazzadegans on the Maynards' petition, and in favor of the Maynards on the Bazazzadegans' counterclaim. The Maynards appeal; the Bazazzadegans do not.

In our review, we accept as true the evidence and permissible inferences which may be drawn therefrom favorable to the prevailing party, and we disregard evidence

to the contrary. *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 246–47[2] (Mo.App.1984); *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 205[3] (Mo.App.1984). Consequently, we summarize the evidence favorable to the Bazazzadegans, as they prevailed on the segment of the judgment attacked on appeal by the Maynards.

The saga began July 25, 1984, when the Bazazzadegans signed a contract with Jim Schudy and Patsy Schudy, wherein the Bazazzadegans agreed to purchase a house and lot owned by the Schudys, at a price of $58,900. The contract provided, among other things, that $1,900 of the purchase price would be paid by the Schudys "carrying a loan" to the Bazazzadegans at interest of 10 per cent per annum, payable in monthly installments of $100, secured by a second deed of trust. The contract further provided: "This contract also contingent on Buyer obtaining financing on or before August 31, 1984."

On August 2, 1984, the Bazazzadegans signed the contract with the Maynards that is the subject of this litigation. The price of the property described in that contract was $50,500. Pertinent to the issues before us, the contract provided: "The Buyer shall deposit the sum of Five Hundred dollars ... upon the signing of this contract ... to be held in escrow ... until this transaction is finally closed, the balance to be paid as follows: By obtaining a 95% loan at current interest rate. General Contingency: This contract is contingent upon qualification for proper financing."

At trial, Mike Bazazzadegan testified his purpose in contracting to buy the Maynard property was to acquire it for his sister and her husband, who were planning to move to Springfield from California. Mike explained that he intended to obtain the loan as he had "outstanding credit," take title to the property in his name, and the loan payments would be made by his sister and her husband. When the indebtedness was retired, Mike would "give them title." He admitted he did not inform the Maynards that he was buying their home for his sister and brother-in-law, and he likewise admitted he did not inform the Maynards

he had signed the contract with the Schudys eight days earlier.

On August 4, 1984, two days after signing the Maynard contract, the Bazazzadegans made their *first* attempt to obtain financing for the two properties they had contracted to buy. According to Mike Bazazzadegan, he needed "around one hundred thousand dollars for two houses." His testimony:

"... what I did is I called loan in the phone book and check all—I give the them, 'How much money do I need for two houses?' And, ask them, 'Am I qualified for loan or not?'

Which they all, all of them gave me same formal order to qualify for loan my total expense per month suppose to be one third my total income, which—you know—at that time they turned me down. I couldn't be qualified for two loans for two houses."

Upon learning that no lender would loan him enough to purchase both properties, Mike Bazazzadegan, so he testified, decided to attempt to obtain one loan from one lender to purchase one property, and another loan from a different lender to purchase the other property. He recounted that on the same day (August 4, 1984) he went to United Savings and Loan, and also to Systematic Savings and Loan, but they rejected his proposal. Mike's testimony:

"They said, you know, same way, it's not going to work. I won't be qualified for the loan even if I go to two different banks because I couldn't be able to obtain two loans."

The week after the Maynard contract was signed, Mike Bazazzadegan telephoned Jeffrey Maynard, stating that the Bazazzadegans were not going to buy the Maynards' home. Mike Bazazzadegan's version of the conversation was:

"I told him I could not obtain the loan on your house and I say, 'I just want to let you know—you know—at you have somebody else in mind you go ahead, don't wait on me'.

Q. What did he say?

A. He didn't response to anything. He said, 'I'll drop by your place, talk to

you again'. I, and I said, 'Whatever you feel like you want to do'."

Jeffrey Maynard admitted that Mike Bazazzadegan did inform him that the Bazazzadegans "weren't qualified to obtain financing" on the Maynard property.

Among the segments of Mike Bazazzadegan's deposition introduced in evidence at trial were these:·

"Question. Did you tell Mr. Maynard when you told him you couldn't qualify for a loan that the reason you couldn't qualify is that you were already buying another house?

Answer. No.

Question. Did you tell him the reason you couldn't qualify is because you were buying another house and his house was really for your brother-in-law?

Answer. No.

. . . .

Question. ... At the time you signed this contract with Mr. and Mrs. Maynard did you have a thousand or two thousand of your own to put down on the Maynard house?

Answer. Probably. I would say probably a thousand or so. I had that."

Sometime prior to August 13, 1984, the Bazazzadegans received a $4,000 loan from Julia Bazazzadegan's father. Thereupon, according to Mike Bazazzadegan:

"We decided not to take a loan from [Jim Schudy] which—you know—we had money for down payment and closing because that was too much money to go per month. We had to pay one hundred dollars to [Jim Schudy] plus six hundred fifty dollars per month to bank, that's why we decided not to take a loan from [Jim Schudy]."

Having made that decision, the Bazazzadegans, on the evening of August 13, 1984, signed a second contract with the Schudys. It was identical to the first, except that the provision that the sellers were to carry a $1,900 loan was deleted.

The first Schudy contract, received in evidence at trial, bears the handwritten notation "VOID 8–13–84." Mike Bazazzadegan testified that Jim Schudy wrote that on

the contract immediately after the second Schudy contract was signed.

The next day (August 14, 1984), the Bazazzadegans filed a written application at United Savings and Loan Association for a loan with which to purchase the Schudy property. The loan was approved in the amount of $55,000, and the sale of the Schudy property to the Bazazzadegans was closed September 25, 1984.

Thereafter, the Bazazzadegans were contacted by the Maynards' attorney. This prompted the Bazazzadegans to submit a written application to Great Southern Savings and Loan Association for a loan with which to purchase the Maynard property. The application, filed October 22, 1984, was denied for the stated reason: "Insufficient Income for Mortgage Payments."

The Maynards filed this suit January 3, 1985. They ultimately sold their property April 4, 1985, for $51,000. Jeffrey Maynard testified that by reason of additional interest, taxes, insurance and advertising costs, plus a real estate agent's commission, he and his wife realized $5,266.50 less than they would have had the Bazazzadegans fulfilled the contract.

Bill Friar, a vice president of United Savings and Loan Association, testified that if the Bazazzadegans, instead of applying for the loan to buy the Schudy property, had applied for a "ninety-five per cent loan" to purchase a house at a price of $50,500, they would have qualified for such a loan. However, said Friar, the Bazazzadegans would not have qualified for such a loan in addition to the loan on the Schudy property.

James Canada, a loan officer at Great Southern Savings and Loan Association, testified he issued the denial of the Bazazzadegans' loan application of October 22, 1984. Canada explained that the Bazazzadegans did not qualify for that loan inasmuch as "they already had one house payment."

The trial court filed findings of fact and conclusions of law. Among the latter were these:

"1. The [Bazazzadegans] were bound by the contract they had previously signed with Jim and Patsy Shudy [sic] at the time they contracted with [the Maynards] on August 2, 1985 [sic]. Therefore, the Bazazzadegans were required to obtain financing for the Shudy [sic] house prior to obtaining financing on [the Maynards'] house.

2. The [Bazazzadegans] contacted several loan institutions by telephone, went to United Savings in person, and made a formal written loan application at Great Southern Savings and Loan. These actions constituted a reasonable effort on the [Bazazzadegans'] part to obtain a loan on [the Maynards'] house.

3. [Bazazzadegans] illustrated through the testimony of Bill Frier [sic], the loan officer from United Savings and Loan Association, and [James] Canada, loan officer at Great Southern Savings and Loan Association, that financing was not available from any source for them to purchase the [Maynards'] house."

The Maynards' first assignment of error avers that the trial court was wrong in conclusion number 1 in holding that the Bazazzadegans were required to fulfill the Schudy contract before they performed the Maynard contract. The Maynards offer three theories in support of their contention. We address the theories individually, in the order in which they appear.

The first is that the Maynard contract "was actually the oldest contract that was not voided by the Bazazzadegans." The Maynards insist that when the Schudys and the Bazazzadegans signed the August 13, 1984, contract, and Jim Schudy thereafter marked the July 25, 1984, contract "VOID," this "relieved both parties from any obligation under the old contract." The Maynards maintain:

"Neither party could enforce the cancelled contract, because the old contract ceased to have legal effect at that point. The execution of the new contract created new and different obligations for the parties.

The Maynard contract was never cancelled. After the original Schudy contract was voided, the Maynard agreement became the oldest contract."

The Maynards assert that the Bazazzadegans should have first complied with the Maynard contract, before proceeding under the August 13, 1984, contract with the Schudys.

The Maynards cite no case supporting their hypothesis, and our independent research has located none.

In weighing the Maynards' argument, we are cognizant that Mike Bazazzadegan, two days after signing the contract with the Maynards, made several inquiries by telephone about obtaining financing to purchase both the Schudy property and the Maynard property, and he also went in person to two lending institutions for that purpose. Those efforts proved unsuccessful. A few days thereafter, Mike Bazazzadegan informed Jeffrey Maynard that he (Mike) could not obtain a loan to purchase the Maynards' property. As we read the record, all this took place *prior* to the signing of the second Schudy-Bazazzadegan contract on August 13, 1984. Consequently, at the time the Bazazzadegans informed the Maynards that they (Bazazzadegans) were unable to obtain financing to buy the Maynards' property, the "oldest" contract then in effect was the Schudy-Bazazzadegan contract of July 25, 1984.

More significantly, however, we find no merit in the Maynards' premise that upon the signing of the second Schudy-Bazazzadegan contract on August 13, 1984, the Maynard-Bazazzadegan agreement "became the oldest contract."

The reason for the signing of the second Schudy-Bazazzadegan contract is clearly demonstrated by the evidence. The $4,000 loan to the Bazazzadegans by Julia Bazazzadegan's father enabled the Bazazzadegans to consummate the purchase of the Schudy property without borrowing $1,900 from the Schudys. The absence of that provision from the second Schudy-Bazazzadegan contract is the only respect in which that instrument differs from the first Schudy-Bazazzadegan contract.

Generally, a contract may be modified by changing some provisions, and yet stand as to the residue of the original agreement. *Freeman Contracting Co. v. Lefferdink,* 419 S.W.2d 266, 273[7] (Mo.App.1967). Had the Schudys and the Bazazzadegans, on August 13, 1984, signed an instrument providing that their contract of July 25, 1984, was amended by deleting therefrom the provision that the Schudys would carry a $1,900 loan, could it be seriously argued that this "cancelled" the July 25, 1984, contract? We think not. What they did on August 13, 1984, left them with the same rights and duties they would have had if they had signed an instrument amending the July 25, 1984, contract by striking the provision for the $1,900 loan.

The fact that the Schudys and Bazazzadegans chose, on August 13, 1984, to sign a complete contract, identical to the original except for the provision regarding the $1,900 loan, manifests that the Schudys and Bazazzadegans intended to maintain, uninterrupted, all of the other rights and duties created by the July 25 contract. That is best illustrated by the fact that Jim Schudy did not mark the July 25 contract "VOID" until after the August 13 contract was signed.

We therefore reject the Maynards' argument that by reason of the signing of the Schudy-Bazazzadegan contract on August 13, 1984, the duty of the Bazazzadegans to buy the Maynards' property is to be deemed as having arisen prior to the duty of the Bazazzadegans to buy the Schudys' property.

The second theory offered by the Maynards in support of their first point is that the Bazazzadegans repudiated the Maynard-Bazazzadegan contract "within a few days following its execution," thereby giving rise to "an immediate cause of action for breach of the contract." The Maynards point out that at the time Mike Bazazzadegan told Jeffrey Maynard that the Bazazzadegans could not obtain financing to buy the Maynards' property, the Bazazzadegans had not yet made formal application for the loan on the Schudy property, and therefore could have qualified for a loan to buy the Maynards' property.

It is clear from the evidence, however, that at the time Mike Bazazzadegan told Jeffrey Maynard that the Bazazzadegans could not buy the Maynards' property, the Bazazzadegans could not obtain financing to buy both the Schudy property and the Maynard property; the Bazazzadegans could obtain financing to buy only one. The Maynards do not contend otherwise. Indeed, they concede in their brief that "after the Bazazzadegans completed the Schudy transaction, they became financially unable to fulfill the financing contingency under the Maynard contract."

The Maynards' argument, boiled down, is that when the Bazazzadegans learned they could obtain financing for only one purchase, the Bazazzadegans should have chosen the Maynards' property, not the Schudys' property.

The only case cited by the Maynards in support of that theory is *Carmel v. Dieckmann,* 617 S.W.2d 459 (Mo.App.1981). It is not in point. There, the buyer *obtained a loan commitment* enabling him to buy the sellers' house, but afterward, for personal reasons, refused to complete the purchase. The sellers refused to return the buyer's $2,000 earnest money deposit, relying on a contract provision that it was to be forfeited to them if the buyer failed to perform. The buyer sued for the return of the deposit. Judgment for the sellers was affirmed.

■ In our view, the law applicable to the Maynards' second theory is found in *Century 21 Al Burack Realtors v. Zigler,* 628 S.W.2d 915, 916[1] (Mo.App.1982), and *Berger v. McBride & Son Builders, Inc.,* 447 S.W.2d 18, 19 (Mo.App.1969), which hold that a provision in a contract to purchase real estate making performance contingent on the buyer's obtaining financing is a condition subsequent, that is, one which by its express terms provides for an ipso facto cancellation on the happening or nonoccurrence of a stipulated event or condition.

■ The Maynard-Bazazzadegan contract explicitly provided that it was contingent upon the Bazazzadegans qualifying for a loan of 95 per cent of the purchase price, at current interest rates. By honoring their contract to buy the Schudys' property, the Bazazzadegans became ineligible for a loan of 95 per cent of the purchase price of the Maynards' property. The Maynards cite no case supporting the premise that when the Bazazzadegans learned they could not borrow enough to purchase both properties, they were obliged to repudiate the Schudy-Bazazzadegan contract so they could buy the Maynards' property. The Maynards' second theory is without merit.

■ The third theory tendered by the Maynards in support of their first point is that the Bazazzadegans were not excused from carrying out the Maynard-Bazazzadegan contract when they "voluntarily placed themselves in a position where performance of the Maynard contract became personally impossible."

The Maynards do not contend that the Bazazzadegans entered into the Maynard-Bazazzadegan contract knowing that they could not find financing to fulfill it if they obtained a loan to buy the Schudys' property. Nothing in the record supports such an inference, and the trial court made no such finding.

We see no difference between the instant case and one in which a buyer, in good faith, enters into a contract to purchase property, contingent upon obtaining financing, and thereafter learns that because of his income level and existing indebtedness, no lender will loan him funds to make the purchase. Missouri cases, cited earlier, excuse the buyer from performance in such circumstances.

The only case cited by the Maynards in support of their third theory is *Christy v. Pilkinton*, 224 Ark. 407, 273 S.W.2d 533 (1954). There, when the time came for the buyers to consummate the purchase, they were unable to raise the money to do so. Nothing in the opinion suggests that the contract contained a provision making per-

formance by the buyers contingent on their obtaining necessary financing. The opinion held that the buyers' financial straits were not a defense to a suit by the seller. The presence of the financing contingency clause in the Maynard-Bazazzadegan contract distinguishes the instant case from *Christy*.

If, in the instant case, the Bazazzadegans, after signing the contract with the Maynards, had decided to renege on it, and for that purpose had intentionally taken steps to disqualify themselves from obtaining the necessary financing, the case would assume a wholly different posture. Such, however, are not the circumstances. The Bazazzadegans entered into contracts to purchase two properties, each contingent on obtaining the necessary financing, and then discovered they could not borrow enough to buy both. Under *Century 21*, 628 S.W.2d 915, and *Berger*, 447 S.W.2d 18, their inability to obtain financing to purchase the Maynards' property relieved them of that obligation. Accordingly, we reject the Maynards' third theory.

We caution that our holding is limited to the unique facts of this case. We are not called upon to decide, and do not decide, what the outcome of this appeal would have been had the Bazazzadegans refused to complete the purchase of the Schudys' property.

The Maynards' second assignment of error asserts that the trial court erred in conclusion of law number 2 in holding that the Bazazzadegans made a reasonable effort to obtain a loan on the Maynards' property. The gist of this point is that the Bazazzadegans never attempted to obtain financing for *only* the Maynards' property, to the exclusion of the Schudys' property, but instead attempted, at the outset, to obtain financing for *both*, and when that proved impossible, decided to finance the Schudy transaction instead of the Maynard transaction. The Maynards add that when the Bazazzadegans made the formal application to Great Southern Savings and Loan Association on October 22, 1984, for funds

with which to purchase the Maynards' property, the Bazazzadegans did so only "to get the Maynards and their attorney off their backs."

The Maynards' argument assumes that the Bazazzadegans were obliged to forgo the purchase of the Schudys' property so that they could obtain financing to buy the Maynards' property. In denying the Maynards' first assignment of error, we rejected that premise.

The evidence amply demonstrates that the Bazazzadegans made a reasonable effort, in good faith, to obtain financing to carry out both purchases, and when they learned that such financing was unavailable, obtained financing to carry out the Schudy purchase. Their inability to obtain financing to also carry out the Maynard purchase, as heretofore explained, excused them from that obligation. The Maynards' second point is denied.

The Maynards' third assignment of error concerns a finding by the trial court that the Maynards never delivered an abstract of title to their property to the Bazazzadegans, as required by the contract. The Maynards allege that the trial court erred in failing to enter a conclusion of law excusing them from that requirement, as the Bazazzadegans were guilty of "anticipatory repudiation," which relieved the Maynards from such duty.

Inasmuch as we have held that the Bazazzadegans' inability to obtain financing to purchase the Maynards' property freed the Bazazzadegans from their contractual obligation to buy it, we need not determine the consequences of the Maynards' failure to furnish the Bazazzadegans an abstract.

The Maynards' fourth (and final) assignment of error concerns the fact that the Maynard-Bazazzadegan contract did not specify a closing date. The Maynards assert that the trial court erred by failing to enter a conclusion of law that the transaction would be closed within a reasonable time. The trial court, say the Maynards, "should have supplied such a term in absence of any agreement between the parties."

This point, like the Maynards' third point, raises no issue affecting the outcome of this appeal. As we have held that the Bazazzadegans' inability to obtain financing to purchase the Maynards' property freed the Bazazzadegans from their contractual obligation to buy it, we need not decide whether the trial court should have declared that the sale of the Maynards' property to the Bazazzadegans should have been closed within a reasonable time.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.