**Robert CRANOR, Respondent,**

v.

**The JONES COMPANY, Appellant.**

**No. 68138.**

Missouri Court of Appeals, Eastern District, Division Three.

March 19, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 1996.

Application to Transfer Denied May 28, 1996.

<hr>

**1.** All further statutory citations will be to RSMo1994, unless otherwise noted.

James D. Bass, Blumenfeld, Kaplan & Sandweiss, P.C., Clayton, for appellant.

Stephen C. Murphy, Devererux, Murphy, Striler & Brickey, L.L.C., Clayton, for respondent.

GARY M. GAERTNER, Judge.

Defendant/appellant, The Jones Company ("Jones"), appeals the judgment of the St. Louis County Circuit Court entering judgment on a verdict awarding plaintiff/respondent, Robert Cranor, $52,440.50 in damages for breach of contract. We affirm.

The following was adduced at trial. In March 1990, Cranor, a licensed real estate broker, was hired by Jones, a home building company, at a meeting between Cranor and Howard Chilcutt, Jones' president. The two entered into an oral agreement wherein Cranor agreed to act as a sales representative for Jones, and Jones agreed to pay Cranor a commission of one and one-half percent (1.5%) of the original contract price for homes sold pursuant to contracts written by Cranor. Cranor was to be paid a "draw" of $1,000 per week, which was applied to commissions he earned for the year; at year's end, Cranor would receive the difference between the commissions he earned and the draw he was paid for that year.

Both Cranor and Chilcutt agreed Cranor specifically asked Chilcutt at that meeting if there was a forfeiture policy at Jones: that is, a reduction in or forfeiture of commissions on contracts written by agent which had not yet closed by the time Cranor left Jones. The two men differed, however, as to Chilcutt's answer. Cranor testified to the following:

Q Did you discuss the forfeiture policy at that time?

A Yes, I did. I inquired to find out what their forfeiture policy was. "If you wrote a contract, did you get paid or not get paid?" And I was told you did get paid.

Q Mr. Chilcutt told you that?

A Yes.

Q Did he put any limitations on that at all?

A No.

Q Did he indicate when you might leave the company that your commissions would be negotiated?

A No, he didn't.

Q Did he indicate there would be any reduction in your commissions to reflect the amount of work that might remain on the contract?

A No, he didn't.

Q Is it your understanding the commission would be paid in full when the contract had closed?

A Yes.

Chilcutt, on the other hand, testified to the following at trial:

Q Was there any discussion during that initial meeting about what would happen in the event Mr. Cranor had some contracts that were pending, but not yet closed at the time he left The Jones Company?

A Yeah. . . . Our typical situation: if we can sit down, I can work out with a person who may join us what the arrangement would be. And that's what I explained to Bob at that time.

Chilcutt further testified on cross-examination:

Q Was it your agreement with him that he gets paid or not depending on when it closes in relation to his employment?

A If the deal closes when he is in our employ, he will get his commission of one and a half percent.

Q Otherwise he wouldn't?

A If he left before it closed, like in our job interview where we sat down and worked out what he got paid when he left.

Q So it was a question of whether he was still with the company when these deals closed, that was the big factor. And had he still been with the company when these transactions closed he would have been paid in full?

A Yes.

\* \* \* \* \* \*

Q ... First of all, you agreed he asked you specifically about your forfeiture policy?

A He specifically asked me about the forfeiture policy. I specifically told him we have no written agreement. We will or I will work it out with them when they leave.

\* \* \* \* \* \*

Q When you say work it out, what do you mean by that?

A I would sit down and talk to the person when they are going to leave, figure out why they are going to leave, see what commissions should be paid to them. You work out something that is acceptable to both parties.

Cranor's first assignment as a sales representative for Jones was at the Deer Creek subdivision. Cranor remained there until February of 1991, when he was transferred to the Tesson Creek subdivision. At the end of 1991, Cranor was transferred to Brookhill Estates.

Cranor's agreement with Jones was modified as a result of his transfer to Brookhill. Another sales representative, Ulli Bowersox, was already assigned there, but Jones needed two sales representatives at Brookhill due to the large amount of work. Jones agreed to pay Cranor his full one and one-half percent commission on every contract written for that subdivision, regardless of which sales representative—Cranor or Bowersox—wrote the particular contract. Thus, Cranor was to

receive commissions on *all* the Brookhill contracts, not just the contracts he wrote.

Cranor worked at Brookhill for eight months, until August 1992. Cranor wrote five of the fifteen Brookhill sales contracts entered into during that time.

In August of 1992, Cranor was transferred out of Brookhill to another subdivision, Twin Chimneys. Cranor was unhappy with this transfer. After working there for a few days, Cranor decided to leave Jones, and began searching for another job.

Three weeks later, on August 27, 1992, Cranor met with Larry Schmidt, vice-president in charge of sales for Jones, and resigned from the company. Schmidt told Cranor he would not get his full commissions from any Brookhill contracts still pending at that time. Jones, in its brief, characterized this as a "reminder" of Jones' forfeiture policy; however, Cranor testified this was the first time he was told he would forfeit his full commission if he left before the closing of a contract. Cranor volunteered to return to Brookhill to finish up the pending Brookhill contracts, but was denied the opportunity.

Shortly thereafter, on September 12, 1992, Schmidt contacted Cranor and proposed reduced commissions for the Brookhill contracts pending when Cranor resigned. Schmidt offered Cranor seventy-five percent of his commissions on contracts that closed within thirty days; fifty percent on contracts that closed after thirty days; zero percent on two contracts where construction had not yet started when Cranor left; and zero percent on one contract where Jones had to refund $10,000 due to misrepresentations to the purchaser. This reduction formula was determined unilaterally by Jones, based on its own estimates. Cranor neither objected to nor accepted this proposal, but merely responded that he would be back in touch with Jones.

Cranor subsequently contacted Schmidt and asked that Jones pay him $45,000 of the total commissions earned by Cranor from all his contracts. Cranor asked for this $45,000 immediately rather than at the end of the year (when his commissions were usually paid). Jones complied with this request, issuing a check for $45,000.

On January 11, 1993, Jones issued Cranor another check, this time for approximately $81,000, roughly $41,000 of which constituted payment for the Brookhill contracts pending when Cranor resigned. This $41,000 was calculated using the reduced commission rates referred to above. The check contained no restrictive endorsements and was unaccompanied by a letter of explanation or an accounting. Cranor accepted the check without comment. Cranor explained at trial why he did not object to Jones' failure to pay the full one and one-half percent commission on the Brookhill contracts:

> Basically I waited until I got the final check because my contention was I had no bargaining tool with The Jones Company. At that point in time they had all my money and basically they have come back and said "Well, look, if you are going to be that way about it, we are going to keep all the commissions". [sic]

Cranor further testified on cross-examination:

Q In fact, you got a check from The Jones Company after the first of the year?

A That's correct.

Q. That check was going to be payment in full for the commissions you were entitled to up to that point in time?

A No.

Q It was not?

A No. I never agreed to [Schmidt]'s terms.

\* \* \* \* \* \*

Q When you picked up that check, you knew in your own mind The Jones Company thought that was payment in full for these commissions; didn't you?

A I never agreed to it.

\* \* \* \* \* \*

Q Prior to them mailing you that check, did you ever express to anyone, either [Schmidt] or [Chilcutt], you didn't consider that to be payment in full?

A I was afraid to.

Q In fact, you never told anyone until after you got paid that you thought you were entitled to more commissions?

A  I didn't tell anybody at The Jones Company.

Q  So if The Jones Company intended this to be payment in full, you didn't do anything to let them know otherwise?

A  No.  I had decided at the point they wrote the check that if there was any agreement to be signed or if there was any endorsement on the back of the check that this was going to be payment in full at that time, I would file a suit.  But from my viewpoint I figured at that point in time basically they can tie up all my money as long as they wanted.  So my feeling was to get the money and then let them know how I felt about it.

Subsequently, in a letter dated January 21, 1993, Cranor told Chilcutt of his belief that Jones owed him the full one and one-half percent commissions on the Brookhill contracts, and requested the balance of commissions earned while he was at Brookhill subdivision.  Chilcutt responded, in a letter dated February 10, 1993, that Cranor had no additional commissions coming.

The last of the Brookhill contracts at issue closed on February 19, 1993.  Two months later, on April 19, 1993, Cranor filed suit against Jones for breach of contract.  In its answer, Jones asserted, *inter alia,* the affirmative defense of accord and satisfaction.

Cranor's action was tried to a jury December 5 through 8, 1994.  Cranor asked for $52,440.50 in additional commissions on the Brookhill contracts that closed after his departure from Jones.  Cranor's figure represented the difference between the full commissions he claimed he should have received from the company, and the amount ($41,000) Cranor actually received.

Jones' motion for directed verdict at the close of the evidence was denied.  The trial court submitted—over Jones' objection—Cranor's verdict director, Instruction No. 6, which read as follows:

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendant entered into an agreement whereby plaintiff agreed to work for defendant as a sales representative at Brookhill Subdivision and defendant agreed to compensate plaintiff a commission of 1.5% of the contract price of all of defendant's homes sold on contracts written by either plaintiff or Ulli Bowersox during the time plaintiff was at Brookhill Subdivision, and

Second, plaintiff performed his agreement, and

Third, defendant failed to perform its agreement, and

Fourth, plaintiff was thereby damaged, unless you believe that plaintiff is not entitled to recover by reason of Instruction No. 8 [the submitted instruction on Jones' affirmative defense of accord and satisfaction].

Jones' own verdict director was refused by the trial court.

On December 8, 1994, the jury returned a verdict in favor of Cranor for $52,440.50. The trial court entered judgment that same day.[1]  Jones' alternative motions for judgment notwithstanding the verdict and for new trial were denied.  This appeal followed.

Jones raises three points on appeal.  For its first point, Jones contends the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict because Cranor failed to offer sufficient evidence of a contract, of a breach of this contract, or of any damages resulting from this breach.

Jones specifically alleges Cranor failed to adduce substantial evidence of an agreement to pay full commissions on all the Brookhill contracts that closed after Cranor left Jones, including the contracts Cranor did not write himself.  Jones argues that, even assuming the company did agree to pay Cranor full commissions on contracts that closed after his departure, this provision applied only to contracts that Cranor wrote and not to contracts written by other sales representatives (i.e., Ulli Bowersox).  Jones also alleges Cranor failed to adduce sufficient evidence of a breach.  Jones further alleges Cranor failed to prove damages, since the full commissions

---

**1.**  The trial court also added prejudgment interest of $8,505.39, calculated at nine percent per an-
num from February 19, 1993 (the date the last of the fifteen Brookhill contracts closed).

on the five Brookhill contracts he wrote totaled $29,400, and he actually received $41,000.

■■■ Jones' argument is without merit. Generally, contracts may be modified as to particular provisions, yet stand as to the residue of the original agreement. *Maynard v. Bazazzadegan*, 732 S.W.2d 950, 954 (Mo. App.S.D.1987). When Cranor was transferred to Brookhill subdivision, the only change to the agreement was that Cranor would receive commissions on all Brookhill contracts, regardless of who wrote them, rather than on contracts he actually wrote. There were no other changes to the agreement. Thus, all other provisions of the original agreement between Cranor and Chilcutt—including the provision that Cranor's commissions would not be reduced on contracts that closed after his departure—remained intact. Additionally, Jones' failure to pay Cranor the full commissions on the Brookhill contracts constituted a breach of this modified agreement, and Cranor's damages were the amount of commissions still unpaid when he filed suit. We see no error. Point denied.

For its second point on appeal, Jones contends the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict because the evidence at trial established, as a matter of law, that Cranor's action was barred by the doctrine of accord and satisfaction.

■■■ "An accord and satisfaction is a contract for the settlement of a disputed or unliquidated claim for an amount less than that claimed by the creditor." *Henderson v. Eagle Express Company*, 483 S.W.2d 767, 768 (Mo.App.K.C.D.1972). There is no accord and satisfaction unless payment is tendered on the *express* condition that it be accepted in full satisfaction of the claim. *Id.* If the creditor cashes a check tendered in payment of an account under such a condition, "an accord and satisfaction results notwithstanding protests on [the creditor]'s part." *Id.* The condition that acceptance means full satisfaction must be made clearly apparent to the creditor. *Id.* Whether an accord and satisfaction has been reached is generally a question of fact. *Id.*

According to Jones, Cranor did not object to the reduced commission rates proposed by Schmidt, and accepted the year-end payment of reduced commissions for the Brookhill contracts as full and final payment of his claims "while secretly maintaining an intention to make a claim for additional commissions after receiving the final payment." Jones asserts Cranor "decided to lull The Jones Company into believing that an accord and satisfaction had been reached by forming a subjective intent to the contrary, 'crossing his fingers', [sic] and voicing his true intent once he had already received in excess of $81,000." Further, Jones claims the above facts were undisputed, coming as they did during Cranor's case-in-chief and from his own testimony, and therefore Jones was entitled to judgment in its favor as a matter of law.

Jones cites *McKee Const. v. Stanley Plumbing*, 828 S.W.2d 700 (Mo.App.S.D. 1992), as support for the above argument. In *McKee*, the Southern District affirmed summary judgment in favor of the debtor, holding that the creditor, who received payment as full and final settlement of his claim, could not make it otherwise by forming a contrary subjective intent, "crossing his fingers," and adding a restrictive endorsement to the check. *Id.* at 706.

However, the debtor in *McKee* expressly offered the check as full and final payment of any claim the creditor had against the debtor, by means of a letter of enclosure which accompanied the check and stated in part:

> Acceptance and negotiation of this check will be considered a full and final release of any claims that he may have against [the debtor]. If [the creditor] does not agree that this is a full and final settlement, please return the enclosed check to me.

*Id.* at 701. By cashing the check, the creditor accepted the debtor's condition that the check constituted full and final payment, despite his later disavowal of an intent to do so. *Id.* at 706.

■■■ Here, there was no accompanying letter setting out such a condition, nor were there any restrictive endorsements on Jones'

check. Cranor testified he specifically looked for such conditions when he received the check, and would have brought suit had any such conditions been present. There was no objective proof of an express agreement between the parties that Jones' check was full and final payment, entitling Jones to judgment as a matter of law. At most, Cranor's passive acceptance of Jones' "final check" made the existence of an accord and satisfaction a question of fact for the jury's determination. We see no error. Point denied.

For its final point on appeal, Jones contends the trial court erred in submitting to the jury Instruction No. 6, Cranor's verdict director. Jones claims the verdict director only submitted undisputed terms of the agreement and therefore allowed the jury to return a verdict without resolving the disputed issue: Cranor's entitlement to full commissions on contracts that closed after he left Jones' employ.

Instruction No. 6 was based on MAI 26.06. MAI 26.06 is appropriate where there is a dispute as to (1) what agreement was made and (2) whether that agreement was breached. *Penberthy v. Nancy Transp., Inc.*, 804 S.W.2d 404, 407 (Mo.App.E.D.1991). "Where the terms of the agreement are in dispute, the verdict-directing instruction must hypothesize the proponent's version of the agreement actually made and failure to do so is prejudicial error." *O'Brien & Assoc. v. American Sportsman*, 819 S.W.2d 62, 64 (Mo.App.E.D.1991). *See also Schlemer v. Connell Agencies*, 741 S.W.2d 307, 308 (Mo. App.S.D.1987).

Here, Cranor argued at trial that he was entitled to full commissions on Brookhill contracts written while he was assigned to that subdivision, regardless of when the contracts closed. Cranor's version of the agreement was hypothesized in Instruction No. 6. If the jury did not believe Jones "agreed to compensate plaintiff a commission of 1.5% of the contract price of all of defendant's homes sold on contracts written by either plaintiff or Ulli Bowersox during the time plaintiff was at Brookhill Subdivision," but rather believed their agreement required a reduction in commissions on the Brookhill contracts

that closed after Cranor left Jones, or was in any way different from the version of the contract set out in the verdict director, the jury could return a verdict for Jones. The disputed issue was implicit in the verdict director. The trial court's submission of Instruction No. 6 was not erroneous. Point denied.

The judgment of the trial court is affirmed.

RHODES RUSSELL, J., concurs.

SMITH, P.J., dissents in separate dissenting opinion.

SMITH, Presiding Judge, dissenting.

I respectfully dissent.

The check was tendered as final and full payment of monies owed to Cranor. Cranor knew when he cashed the check that it was so tendered. There was accord and satisfaction as a matter of law. *McKee Construction Company v. Stanley Plumbing & Heating Company*, 828 S.W.2d 700 (Mo.App.1992) [4–6].

I would reverse the judgment.